| | | |
|---|---|---|
| **ROBERT WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 05 C 3696** |
| | ) | |
| **VILLAGE OF FRANKLIN PARK, a** | ) | **Judge Rebecca R. Pallmeyer** |
| **municipal corporation, RANDALL** | ) | |
| **PETERSEN, individual and in his official** | ) | |
| **capacity as the Chief of Police of the** | ) | |
| **Village of Franklin Park, MICHAEL WITZ,** | ) | |
| **individually and in his official capacity as** | ) | |
| **the Commander of the Franklin Park Police** | ) | |
| **Department, BARBARA CASCIO,** | ) | |
| **individually and in her official capacity as** | ) | |
| **an investigator and Sergeant of the Franklin** | ) | |
| **Park Police Department, and the BOARD** | ) | |
| **OF FIRE AND POLICE COMMISSIONS** | ) | |
| **OF THE VILLAGE OF FRANKLIN PARK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Wright is a sergeant in the Village of Franklin Park Police Department, and is the president of the Illinois Fraternal Order of Police Lodge #47. In this lawsuit, he alleges that Village officials retaliated against him for the exercise of his First Amendment rights by suspending him for fifteen days in 2005. The Defendants are former chief of police Randall Petersen, sergeants Michael Witz and Barbara Cascio, the Board of Fire and Police Commissioners ("the Board"), and the Village of Franklin Park ("the Village"), which is a unit of local government in Cook County. Wright claims that Petersen, with the help of Witz and Cascio, filed termination charges against him in December of 2004 in retaliation for activities that took place years earlier—most significantly, his public advocacy in the late nineties for Petersen's removal as police chief—as well as for his continued advocacy of union members' grievances. These charges were based primarily upon Wright's failure to promptly respond to the scene of a shooting incident on August 20, 2004. The

Board held an adversarial hearing over several days from February through May of 2005, and found that Wright had violated several department rules, but it declined to terminate Wright, choosing instead to impose a fifteen-day suspension.

Wright's six-count complaint alleges that the individual defendants are liable under 42 U.S.C. § 1983 for violating his rights to freedom of expression and association (Count I) and his right to equal protection (Count II), and for conspiring to violate his constitutional rights (Count III). He claims that their conduct also constituted an intentional infliction of emotional distress under Illinois law (Count IV). He asks this court to review the decision of the Board in an action for administrative review (Count V), and further charges that Petersen violated § 1983 by denying him due process in his hearing before the Board (Count VI). Wright also argues that the Village is subject to *Monell* liability for Petersen's acts.

Petersen, Witz, Cascio, and the Village have moved for summary judgment on all of Wright's claims. Additionally, Wright, Petersen, and the Board have submitted briefs discussing whether or not the court should sustain the Board's decision on administrative review. For the reasons discussed below, the court affirms the Board's decision, and grants the Defendants' motions for summary judgment.

## BACKGROUND

The following facts are drawn from the pleadings, the parties' Local Rule 56.1 submissions, and from the administrative record.

## I.     The Parties

Wright is a sergeant in the Franklin Park Police Department, where he has worked since 1990. (LR 56.1 Resp. [203] ¶ 2.) As an officer, Wright has worked both as a street sergeant and as the acting Watch Commander on the midnight shift. (*Id.*) His duties as acting Watch Commander include supervising officers working on the midnight shift and taking responsibility for what goes on at the station. (*Id.*) Wright is also the president of the police officers' union; in this

capacity, he files grievances on behalf of union members, advocates for members' rights, and represents the membership generally. (*Id.* ¶ 22.)

Petersen was the Chief of Police in Franklin Park from an unknown point in time until after the Amended Complaint was filed on November 9, 2006, except for a brief period in the Spring of 1999, when he was temporarily replaced by Rocky Fortino. (LR 56.1 Resp. ¶ 4, Summ. J. Resp. [204] at 2; Petersen Summ. J. Mem. [175] at 12.) As Chief of Police, Petersen does not have the authority to discharge police officers, or suspend them for more than five days, but he does have the authority to order investigations into wrongdoing and recommend that the Board order a suspension or dismissal. (LR 56.1 Resp. ¶¶ 13-14.)

Witz is a sergeant, appointed by Petersen to serve as Patrol Division Commander. (LR 56.1 Resp. ¶ 11.) In this capacity, he was in charge of all the department's internal investigations. (*Id.* ¶5.) Cascio, also a sergeant, was appointed by Petersen to assist Witz as an investigator. (*Id.* ¶ 6.) The Board is an administrative body, charged with overseeing the discipline of Franklin Park police officers. (LR 56.1 Resp. ¶ 7.) The Village is a unit of local government in Cook County, Illinois. (*Id.* ¶ 3.)

## II.    Wright's Advocacy of Union-Related Issues

Although the parties have offered few details regarding Wright's activities, they agree that he engaged in the advocacy discussed below.

First, in approximately 1997, Wright advocated for "open residency," meaning the right of police officers to live outside the boundaries of the Village. (LR 56.1 Add'l Resp. [214] ¶ 3; Wright Dep. Pt. I, 9/15/06, at 37:11.) The following year, Wright "led a letter writing campaign" regarding what he believed to be the "improper use of police insignia." (LR 56.1 Add'l Resp. ¶ 4.) This issue arose out of Petersen's decision to authorize the use of official police insignia on t-shirts, apparently as a public relations or campaign strategy. (Wright Dep. Pt. I at 189:21-190:5.) Wright believed that this presented a "public safety issue"; his views resulted in "public altercations" between Wright,

the Mayor, and the Mayor's wife.  (LR 56.1 Add'l Resp. ¶ 4; Wright Dep. Pt. I at 191:7-12.)

In October of 1998, Wright "spearheaded" a union no-confidence vote against Petersen, who was by then the Chief of Police.  (LR 56.1 Add'l Resp. ¶ 2; Petersen Am. Answer [119] ¶ 16.)  As noted earlier, in March of 1999, Petersen was briefly removed from office and replaced by Lieutenant Rocky Fortino; at that time, Wright, on behalf of the Union, posted a notice indicating its commitment to work with Fortino.  (LR 56.1 Add'l Resp. ¶ 2; Petersen Am. Answer ¶ 17.)  The parties have not made clear why Petersen was removed, or whether it was a result of Wright's or the union's efforts.  After a municipal election, Petersen regained his office in April of 1999.  (Petersen Am. Answer ¶ 18.)  Petersen admits that Wright "publicly opposed" his reappointment at this time,[1] and that Wright chaired a union meeting in which members voted in favor of retaining Fortino.  (LR 56.1 Add'l Resp. ¶ 2; Petersen Am. Answer ¶18.)  This vote was subsequently reported in the news media.  (Petersen Am. Answer ¶ 18.)

Finally, in his role as union president, Wright has submitted and advocated numerous grievances charging Petersen with violations of the union contract.  (LR 56.1 Add'l Resp. ¶ 6.)  Wright has presented no details regarding the content of these grievances, aside from a spreadsheet listing fifty-eight grievances, identified only by date (ranging from 1998 through 2005) and by categories such as "Hire Back" and "Perm. Shifts."  (List of Grievances, App. 1 to Wright Dep. Pt. I.)

### III.    Negative Reactions to Wright and His Union Advocacy

Wright has collected a number of critical comments or remarks by the Defendants, which he claims show that his union advocacy "has not sat well with Petersen."  (Summ. J. Resp. at 3.)

---

[1]    None of the parties have clarified what speech or conduct Wright engaged in that constituted public opposition to Petersen at this time, other than chairing and attending the union meeting at which "members" voted to retain Fortino (it is not contended that Wright voted for Fortino, or even that he voted at all).  Neither Wright nor any of the Defendants has offered evidence of any statements he made on this subject at the time, either to the union or to the media.

There was an incident at a union meeting in May of 1999 involving Wright and Petersen. Petersen, as Chief of Police, was authorized to participate in the union's "fraternal end," which "is basically a fraternal or social organization," but not its "labor end," which handles negotiations, grievances, labor disputes, and unfair practices. (LR 56.1 [180] ¶ 18; LR 56.1 Resp. ¶ 18.) Wright asked Petersen to leave the meeting so that labor issues could be discussed. He and other officers contend that Petersen resisted, saying something like, "This is my police station; I'm not leaving." (Petersen Am. Answer ¶ 19; Wright Dep. Pt. III, 12/14/06, at 227:15-19; Quiroga Dep. at 19:7-12; Henniger Dep. at 131:13-15.)

Petersen admits having publicly complained about Wright. (Petersen Am. Answer ¶ 14.) Petersen posted grievances filed by Wright on the wall of his office. (LR 56.1 Add'l Resp. ¶ 9.) Officer Konwinski reported having several conversations[2] with Petersen during which Petersen told him that the department would run more smoothly if Wright were not union president, because Wright filed an excessive number of grievances. (Konwinski Dep. at 56:7-23.) Petersen also admits having spoken to the mayor regarding Wright at an unspecified time, observing, "maybe if there was some newer blood, there might be a change"; he explained, however, that the "change" he was referring to was the possibility of having a Christmas party again, which had not occurred since Wright had been president.[3] (Petersen Dep. at 30:10-33:4.)

Wright contends that Petersen "often voiced his dislike" for him. (LR 56.1 Resp. ¶ 8.) The only additional evidence he cites regarding these expressions of dislike is the testimony of Officer Jones. Jones stated that Petersen had made comments about "not liking Rob Wright" more than

---

[2]     The deposition excerpts provided to the court do not reveal when these alleged conversations took place, although it is indicated that they occurred in Petersen's office while Konwinski was "on-shift." (Konwinski Dep. at 56:1-23.)

[3]     The record does not make clear why Wright's service precluded Christmas parties. Petersen testified that Wright "may have been responsible" for their discontinuation, but he could not remember any specific actions taken by Wright or the Union relating to the parties. (Petersen Dep. at 31:19-32:22.)

once, but he could not remember when or to whom Petersen made such statements. (Jones Dep. at 165:9-18.)

Wright also contends that Witz and Cascio harbored animosity towards him because of his union activities. Officer Henniger testified that Witz told him that the union was "foolish" for filing so many grievances, and that "they weren't going to win."[4] (Henniger Dep. at 188:14-19.) Officer Glover testified that Cascio had expressed "negativity" towards the union's officers, and Investigator Michael Jones testified that Cascio had referred to Wright as "an asshole" or "fuckin[g] Rob," and that "she didn't like him"; he attributed this dislike to issues involving shift transitions and paperwork, however,[5] and not to Wright's union activities. (Glover Dep. at 17:4-19; Jones Dep. at 59:10-23.)

## IV.   Contentions of Prior Retaliation by Petersen

Wright contends that on several occasions, Petersen treated him unfavorably with respect to job assignments in retaliation for his union activity. First, he contends that, two days after the union meeting in May 1999 that Petersen refused to leave, Petersen removed Wright from the position of Field Training Officer Supervisor, and assigned Witz to that position. (Wright Bd. Test., 4/5/2004, at 128:16-17.)

Later in 1999, Wright, who was serving as acting Watch Commander, applied for the permanent Watch Commander position. (Petersen Am. Answer ¶ 22.) Petersen abolished the

---

[4]     Who "they" were, and what "they" were not likely to "win," is not clear from the single page excerpted by Wright, although this statement appears to refer to the likelihood that the union would receive favorable action on its grievances. (Henniger Dep. at 188:11-22.)

[5]     According to Jones, Cascio's dislike stemmed from "stuff involving . . . midnight shift was leaving, day shift was taking over" and "[i]f there was a prisoner or some sort of paperwork that was not completed . . . ." (Jones Dep. at 59:19-22.) No further information regarding these issues appears in the record.

permanent position, but Wright nevertheless continued to serve as an acting Watch Commander.[6] (*Id.*) At some unspecified time between 1999 and 2002, Wright demanded to be paid a stipend of $1000 for filling the acting position. (*Id.*) He argued that he was entitled to this, because it is what a permanent Watch Commander would have received; he admits, however, that there was no extant contractual provision giving an acting Watch Commander the right to a stipend. (Wright Dep. Pt. III, 12/14/06, at 249:18-24, 251:18-252:3.) After Wright filed a grievance about this issue, Petersen paid him the stipend, but refused to recreate the position of permanent Watch Commander so that Wright could fill it. (*Id.*) In December of 2002, Petersen reestablished the position of permanent Watch Commander, and gave the job to sergeant Phil Ruch, even though Wright had served as an "acting Watch Commander" for the preceding two years. (*Id.* ¶ 23.)

In March of 2003, Wright applied for the position of evidence technician supervisor. (Petersen Am. Answer ¶ 25.) Petersen, however, gave the position to sergeant Robert Jensen, who had less seniority and experience than Wright. (*Id.*)

Finally, in November of 2003, Petersen replaced Ruch with Jensen as permanent Watch Commander, despite the fact that Wright had more seniority and experience as an acting Watch Commander than Jensen.[7] (Petersen Am. Answer ¶ 26.) By August of 2004, Wright was once again working as an acting Watch Commander. (LR 56.1 Resp. ¶ 9.) The parties have not explained whether there were two Watch Commanders at this point—Jensen in the permanent position and Wright in the acting one—or if, at some time between November of 2003 and August

---

[6]    How the position could have been abolished, but then filled in an acting capacity, is a curiosity that the parties have chosen not to explain to the court.

[7]    It is not clear whether or not Jensen had previously served as either an acting or permanent Watch Commander. It seems unlikely, however, because Jensen only became a sergeant in early 2003 (Petersen Am. Answer ¶ 25), and because Ruch apparently served as a permanent Watch Commander from November 2002 until replaced by Jensen in November 2003. Nevertheless, no party has contended that being a sergeant is a prerequisite to serving as an acting Watch Commander, so it remains possible that Jensen had previously filled the position for some amount of time less than Wright's three years in the acting role.

of 2004, Petersen removed Jensen from the permanent position, abolished the permanent position once again, and reappointed Wright in an acting capacity.

## V.  The Shooting Incident

On August 20, 2004, Wright was working the overnight shift as acting Watch Commander and street supervisor.  (Petersen Am. Answer ¶ 27.)  At approximately 1:46 A.M., Officer Tom Henniger was on patrol when he heard gunshots near Buddy's Bar in Franklin Park.  (*Id.* ¶ 28.)  He reported the shots over the police radio, and four other policemen responded to the scene.  (*Id.*)

Wright was at the station when the shooting was reported over the radio; he contends that he did not hear the call because his radio was turned down.  (LR 56.1 Resp. ¶ 36.)  Wright did not learn of the shooting until after 2:00 AM, when desk clerk Marlene Santoro informed him that there had been a shooting.  (*Id.*; Petersen Am. Answer ¶ 30.)  At that time, he was also informed by Dispatcher Ted Traister that Veteran's Park District Officer Fogg was en route to the station with a suspect from the shooting in custody.  (LR 56.1 Resp. ¶ 36; Petersen Am. Answer ¶ 31.)

Rather than proceed immediately to the scene of the shooting to supervise on-site, Wright told Traister that he would remain at the station to let Officer Fogg into the building.  (LR 56.1 Resp. ¶ 36; Petersen Am. Answer ¶ 32.)  As he left the "records room," Wright encountered Officer Glover, who was escorting another shooting suspect into the station.  (Petersen Am. Answer ¶ 33.)  Although he could have asked Glover to remain at the station so that he could proceed to the scene himself, Wright instead directed Glover to return to the scene.  (LR 56.1 Resp. ¶ 34.)

Wright remained at the station, monitoring the radio, watching the suspect who was at the station, and waiting for the subject in Officer Fogg's custody to arrive.  (Petersen Am. Answer ¶ 35.)  He was in communication with the officers at the scene, and he asked the dispatcher to call an investigator to go to the scene.  (*Id.*)  Meanwhile, the officers at the scene were searching for additional suspects.  (LR 56.1 Resp. ¶ 34.)  Officers Fogg and Glover subsequently arrived at the station with a second and a third shooting suspect.  (Petersen Am. Answer ¶ 38.)  Wright did not

8

search these suspects before detaining them in the interview room.  (Summ. J. Resp. at 7.)  Officer

Glover also did not search the two suspects he arrested before placing them in an interview room,

though he had searched them at the time of the arrest.  (Hr'g Tr. vol. III, 2/23/05, at 112, 122.)

Chief Petersen testified that he was woken at about 2:13 AM by a phone call from

Dispatcher Traister regarding the shooting.  (Hr'g Tr. vol. IV, at 8, 3/22/05.)  He got dressed, drove

to the station, directed Wright to order more officers to the scene, and arrived personally at the

scene by "slightly after 2:30."  (*Id.* at 8-10.)  He did not, however, order Wright to go to the scene

when he spoke with him.  (Petersen Am. Answer at 37.)

Commander Witz testified that he received a phone call regarding the shooting around 2:13

that morning, and that he arrived on the scene about ten or fifteen minutes before Petersen.  (Hr'g

Tr. vol. III, 3/10/05, at 14.)  Witz also did not order Wright to go to the scene that evening.  (Witz

Am. Answer ¶ 37.)

Wright finally went to the scene of the shooting at 3:15 AM, more than an hour after being

notified of it.  (LR 56.1 Resp. ¶ 32.)  He contends that his departure was delayed, in part, because

Petersen asked him to remain at the station and call in off-duty personnel, and notes that neither

Petersen nor Witz ordered him to go to the scene.  (LR 56.1 Resp. ¶ 36.)

## VI.    The Investigation of Wright and the Filing of Termination Charges

Within a few days of the shooting incident, Petersen opened an investigation into Wright's

actions.  (Petersen Am. Answer ¶ 40.)  He ordered Witz to conduct the investigation; Cascio

assisted Witz.  (*Id.* ¶ 41.)[8]

---

[8]    Wright identifies a lengthy list of perceived irregularities during the course of the
investigation.  Because Wright has not suggested that either Witz or Cascio had the authority to
cause a materially adverse change in his employment, however (*e.g.*, LR 56.1 Resp. ¶¶ 13-15), the
court cannot see how the details of their investigation are relevant to Wright's claims.  For this
reason, the court need not review Witz's and Cascio's alleged misdeeds in detail, apart from noting
that, according to Wright, Witz and Cascio tried to get witnesses to alter their testimony and state
that he never appeared at the scene of the shooting.  (LR 56.1 Add'l ¶ 52.)  Leaving aside the weak
(continued...)

Ultimately, Petersen filed termination charges against Wright on December 22, 2004. (Bd. Dec. at 1; Charges, Joint Ex. 1 to Hr'g Tr.)  He charged Wright with violating a number of departmental rules on the night of the shooting incident, based upon allegations that Wright (1) failed to go to the incident scene as soon as possible, (2) failed to search the suspects before detaining them in the interrogation room, (3) failed to request mutual aid from a neighboring police department so that he could proceed to the scene, (4) failed to provide medical attention for a bleeding prisoner or document the extent of that prisoner's injuries, (5) failed to supervise a show-up identification procedure involving one of the shooting suspects, (6) filed a false report regarding a radio malfunction, and (7) failed to document any such malfunction in his daily activity report. (Charges at 3-7.)

Margaret Regan, the secretary to the Board, testified that Petersen met with the Board at the time that Petersen was filing charges against Wright. (Regan Dep. at 22:20-23:1.)  Although Petersen denies it, Regan testified that, at this meeting, Petersen told members of the Board that he had a "slam-dunk" case against Wright, that Wright "did not do his job," and that Wright "did not show up at the shooting." (*Id.* at 20:2-4.)  This conversation occurred before the Board held hearings on the charges.

After disclosure of the basis of the charges, the Board conducted a trial-type adversarial hearing, hearing twelve days of sworn testimony over the course of four months. (Bd. Dec. at 1.) Wright was represented by counsel at this hearing, and he testified in his own behalf; Cascio, Witz and Petersen were among the seventeen other witnesses. (Bd. Dec. at 1-2.)  On May 21, 2005, the Board issued its decision.  The Board found that Wright had violated departmental rules

---

[8](...continued)
evidentiary support for this assertion, there is no contention that any witness was in fact induced to testify falsely, so Wright has not shown how such misconduct could violate his constitutional rights.  Similarly, the court will not recount Wright's list of alleged procedural irregularities in the investigation, such as the failure to prepare a "final report" before filing disciplinary charges (Summ. J. Resp. at 12), because Wright has not explained the relevance of such irregularities to his claims.

requiring him to supervise the response to the shooting incident "at the scene," and requiring him to search prisoners before placing them in detention. (Bd. Dec. at 5-6.) It did not, however, find that Wright had broken departmental rules by failing to summon medical assistance for the prisoners, by failing to go to the scene of the show-up identification procedure, or by failing to properly report radio malfunctions. (*Id.* at 7.) The Board explicitly considered, and rejected, Wright's defense that the charges had been brought in retaliation for his union affiliation, concluding that Petersen's decision to file charges was not based "in whole or in part on anti-Union animus." (*Id.*) Finally, the Board determined that, although Wright's misconduct was severe enough to warrant termination, his "record of no prior disciplinary action" throughout his career in the department was a mitigating factor, as was his prior thirty-day suspension without pay pending the hearing. (*Id.* at 8-9.) Accordingly, the Board concluded that a further suspension of fifteen days without pay was a more appropriate penalty than termination. (*Id.* at 9-10.)

## VII.    The Incident Involving Officer Jones

On September 12, 2004, at approximately 1:30 A.M., Sergeant Jensen ordered Mike Jones, an on-call investigator who was not on duty at the time, to report to the scene of a shooting at Grand Stand Pizza. (LR 56.1 Add'l Resp. ¶ 62.) According to Jensen, Jones, while speaking to him on the phone that night, stated that he "hated his job and hated being an investigator," but agreed to go to the scene. (Hr'g Tr. vol. IV, at 27, 4/5/05.) Jones did not in fact go to the scene; rather, he fell back asleep after receiving the call, and did not arrive at the scene until twelve hours later. (Summ. J. Resp. at 16.) Jones testified that this failure was not intentional, but rather arose from an involuntary lapse into sleep, and Wright has not disputed this. (Jones Dep. at 105:22-106:6; LR 56.1 Resp. ¶ 155.)

Jones testified that Petersen spoke to him after the incident, and told him not to worry, because he had done nothing wrong and had done a good job. (Jones Dep. at 12:9-11.) He clarified that Petersen "wasn't commending [him]" for failing to show up on time, but rather, was

explaining that his failure to appear at the scene had been harmless because a witness could not have been interviewed at that time due to intoxication. (*Id.* at 12:16-21.) Petersen denies telling him not to worry at this time. (LR 56.1 Add'l Resp. ¶ 66.)

Petersen did not initiate an investigation of Jones's failure to appear at the Grand Stand Pizza incident until two days after Wright made a discovery motion regarding the incident in preparation for his hearing. (LR 56.1 Add'l Resp. ¶¶ 67-69.) According to Petersen, the investigation was delayed until the public integrity unit of Cook County had completed its own investigation of Officer Jones. (LR 56.1 ¶ 151.) At the conclusion of his own investigation, Petersen imposed a one-day suspension on Jones as punishment. (LR 56.1 Resp. ¶ 147.)

Wright contends that Petersen only initiated the investigation against Jones in order to quell suspicion that he was biased against Wright. (LR 56.1 Resp. ¶ 151.) The only evidence he cites makes no mention of Petersen: Jones' testified regarding a conversation with Deputy Chief Krecker, claiming that Krecker told him that he expected to be Chief of Police soon, that he disagreed with the suspension, and that he would remove it from Jones's file. (Jones Dep. at 23:2-15.) Krecker denies this, stating that he only told Jones that he would make it possible for him to make up the hours lost due to the suspension. (Krecker Dep. at 132:5-17.)

## VIII. Wright's Claims

Wright is suing Petersen, Witz, Cascio, the Board, and the Village. In this lawsuit, he asks the court to overturn the Board's decision (Count V). (Am. Compl. ¶¶ 93-96.) Additionally, he claims that, by investigating him and bringing termination charges against him, the three individual defendants retaliated against him for the exercise of his freedom of expression and association (Count I), deprived him of his right to the equal protection of the laws (Count II), and intentionally inflicted emotional distress upon him (Count IV). (*Id.* ¶¶ 74-84, 90-92.) He also claims that the individual defendants unlawfully conspired to deprive him of his constitutional rights (Count III). (*Id.* ¶¶ 85-89.) He claims that Petersen and the Board deprived him of due process of law in the

hearing that led up to his fifteen-day suspension (Count VI). (*Id.* ¶¶ 97-104.) Finally, he claims that the Village is liable for the wrongs committed by Petersen because Petersen was a final policymaker for the Village. (Summ. J. Resp. at 18.)

**DISCUSSION**

The Board has requested that the court address the administrative review count before addressing Wright's other claims, in the belief that the decision, if affirmed, might have preclusive effect as to the other counts. As Wright has not opposed this request, the court will discuss the administrative review count before proceeding to the summary judgment motions.

## I.      Administrative Review of Count V

In Count V, Wright seeks administrative review of the Board's determination that he was guilty of misconduct, of its imposition of a fifteen-day suspension as punishment, and of its rejection of his retaliation defense. (Am. Compl. ¶ 94; Pl.'s Mem. in Support of Count V [64, "Count V Mem."], at 4, 9, 14.) He alleges that the decision was erroneous and against the manifest weight of the evidence, and also that it violated his Due Process rights. (*Id.* ¶ 95.) He brings this claim pursuant to the Illinois Administrative Review Law, 735 ILCS 5/3-101 *et seq.*, invoking the court's supplementary jurisdiction.

The Administrative Review Law permits the court to affirm or reverse an administrative decision in whole or in part, or remand it for further proceedings. 735 ILCS 5/3-111(a). On review, a court treats administrative findings of fact as "prima facie true and correct," *id.* at 5/3-110, and does not resolve factual inconsistencies or reweigh the evidence. *Launis v. Bd. of Fire and Police Comm'rs*, 151 Ill. 2d 419, 427-28, 603 N.E.2d 477, 481 (1992). Rather, review is limited to determining whether findings of fact are against the manifest weight of the evidence, and if not**,** whether those findings supported the administrative decision. *Id.* at 427-28, 435, 603 N.E.2d at 484.

The Board has furnished the court with a copy of the administrative record, and all the

parties have had an opportunity to submit memoranda regarding the validity of the Board's decision. Thus, this issue is ripe for decision, and as the parties have been given notice of this court's intention to resolve the issue based on the record (*see* Hr'g Tr., 9/14/07, at 8-11), the court will proceed as if cross-motions for summary judgment had been filed. *See Int'l. Coll. of Surgeons v. City of Chicago*, at *3 & n.4 (N.D. Ill. Jan. 9, 1995), *rev'd on other grounds*, 91 F.3d 981 (7th Cir. 1996), *rev'd*, 522 U.S. 156 (1997), *orig. opinion aff'd*, 153 F.3d 356 (7th Cir. 1998).

Wright has submitted a memorandum alleging several defects in the Board's decision. First, he argues that its findings that he violated various departmental rules were against the manifest weight of the evidence. Second, he argues that the Board erred by concluding that those rule violations warranted a fifteen-day suspension. Third, he argues that the Board's rejection of his retaliation defense was against the manifest weight of the evidence. The court will consider each argument in turn.

**A.    Rule Violations**

**1.    General Order 6-3(F): Failure to Direct the Investigation On-Site**

**a.    Determination that Wright's Absence from the Scene Violated General Order 6-3(F)**

The Board found that Wright violated General Order 6-3(F) because he did not arrive at the scene of the August 20, 2004 incident until approximately ninety minutes after he was notified that a shooting had occurred. (Bd. Dec. at 3.) Wright argues that this determination reflects a misinterpretation of General Order 6-3(F). (Count V Mem. at 20.) General Order 6-3(F) requires a commanding watch officer to:

> Direct the performance of his/her subordinates at all major incidents . . . and coordinate the operations of all department units at the scene of incident unless relieved by a superior ranking officer.

G.O. 6-3(F) (Chief Ex. 3 to A.R., at 25.) The Board interpreted this Order to require a commanding officer to physically travel to the incident scene. (Bd. Dec. at 3-4.) Wright contends that this

14

reading is erroneous, in part because the "plain language" of the Order only requires a supervisor to coordinate the operations of department units who are themselves present at the scene. (Count V Mem. at 20.)

Illinois courts give "great weight" to the constructions of an administrative agency charged with enforcing a regulation, and will not overturn agency interpretations unless they are "clearly erroneous, arbitrary or unreasonable." *LaBelle v. State Employees Ret. Sys.*, 265 Ill. App. 3d 733, 736, 638 N.E.2d 412, 415 (2d Dist. 1994); *see Hollinger Int'l, Inc. v. Bower*, 363 Ill. App. 3d 313, 316, 841 N.E.2d 447, 450 (1st Dist. 2005). As this court understands the plain language of the Order, it can logically be read either to say that "the Watch Commander must coordinate the operations of units *who are at the scene*," as Wright urges, or to say that "the Watch Commander must coordinate the operations of department units, *and he must do so at the scene*," which is the interpretation that the Board relied upon. Because the court has no reason to conclude that the Board's construction was "clearly erroneous, arbitrary, or unreasonable," it will be upheld.

Wright's other arguments in favor of his interpretation misconstrue the duty of this court on administrative review. He notes that another section of the General Orders uses different language ("the Watch Commander will proceed to the scene") when requiring an officer to be physically present at a scene (Count V Mem. at 20), and suggests that the absence of such language in General Order 6-3(F) requires the conclusion that physical presence is not required. Assuming these language choices militate in favor of his construction, they do not establish that the Board's alternative construction is clearly wrong, arbitrary or unreasonable. Likewise, the fact that Officers Henniger and Glover, both patrolmen on the midnight shift, may have had a contrary view of the Order's meaning merely establishes that there is room for reasonable disagreement, not that their interpretation is necessarily correct.

Finally, Wright contends that the court should reject the Board's interpretation because it is not "practical" when viewed in the context of police work. (Count V Mem. at 21.) The court

declines to do so. The Board, being composed of police and fire commissioners, is far more competent to decide what is or is not a "practical" means of responding to shootings than is the court. Indeed, it is for this very reason that the court defers to the expertise of administrators when they construe regulations they are charged with enforcing. *LaBelle*, 265 Ill. App. 3d at 735, 638 N.E.2d at 415. Thus, the Board did not err by using its finding that Wright did not appear at the scene for ninety minutes as the basis for concluding that he violated General Order 6-3(F).

**b.     Determination that Wright's Failure to Go to the Scene Was Not Excusable**

After finding that General Order 6-3(F) required Wright to be at the scene at his first opportunity, the Board further determined that his asserted justifications for the ninety-minute delay were insufficient. (Bd. Dec. at 3-4.) In addition to the factual challenges discussed above, Wright also argues that this determination was based on flawed reasoning. (Count V Mem. at 22.)

The Board based its finding that the delay was not excusable upon its determination that there was no need for Wright to remain at the station. This conclusion had several independent bases. First, the Board concluded that Wright could have gone to the scene immediately after hearing of the shooting, because there were no prisoners at the station at that time, and because Veteran Park Police Officer Fogg (who was *en route* with a prisoner) either could have been let into the police station by dispatcher Ted Traister, or could have waited in his car with his prisoner until another officer returned to the station. *(*Bd. Dec. at 3-4.)

Wright argues that these facts do not support the Board's decision because Traister would have been unable to leave the communications center to open the door for Officer Fogg. (Count V Mem. at 21.) Assuming he is correct, this does not undermine the Board's conclusion that Officer Fogg could have remained in his car with his prisoner until someone else could grant him access to the station. Wright's further argument, that he could not leave because he had to watch over Glover's prisoners, fails for the simple reason that the Board determined that, when Wright first

heard of the shooting, there were no prisoners in the police station requiring the presence of any officer. (Bd. Dec. at 3.) This finding of fact is *prima facie* correct, *see* 735 ILCS 5/3-110, and Wright has not contested it.[9] Thus, the Board's determination that Wright had no excuse for not proceeding immediately to the scene of the incident upon learning of the shooting is supported by its findings of fact.

The Board had a second basis for its determination that the delay was inexcusable: it determined that Wright could have left the station once Glover arrived, because Glover could have watched over the station and let Fogg and his prisoner into the building. (Bd. Dec. at 3-4.) Wright assails this conclusion by arguing that it was crucial for Glover himself to return to the scene of the shooting. (Count V Mem. at 22.) The court, however, is clearly less competent than the Board to determine the degree to which any individual officer is necessary at the scene of a shooting. Therefore, the mere facts that Glover was familiar with the scene, and had been involved in setting a perimeter and searching for suspects (Count V Mem. at 22), do not convince the court that the Board made any error by concluding that Glover could have been spared so that Wright could engage in on-site management of the investigation.

The Board had one other basis for finding the delay to be improper: it concluded that Wright could have complied with General Order 6-3(F) by requesting assistance from another police department, which would have freed up one of his own officers to return to the station. (Bd. Dec. at 4.) Wright argues against this conclusion by asserting that there was no rule requiring him to call in additional manpower, and by asserting that there was no manpower shortage in any event. (Count V Mem. at 22.) This misses the point; Wright was required to go to the scene, and if he contends that he could not do so because he lacked manpower to staff the station in his absence,

---

[9] Similarly, Wright's contention that compliance with General Order 6-3(F) should be excused because Chief Petersen did not order him to the scene requires little discussion; the Board found that Wright failed to inform Chief Petersen that a putative manpower shortage prevented him from going to the scene, and Wright does not challenge this finding. (Bd. Dec. at 4.)

calling for mutual aid would have resolved the problem. Wright does not argue that he was forbidden to call for aid. (Count V Reply at 8.) Similarly, his claim that there was no manpower shortage does not help, but rather hurts him; if there was no manpower shortage, than he could have called an officer back to the station in order to comply with General Order 6-3(F).

The court concludes that the Board's determination that Wright's failure to go to the scene was inexcusable is support by the record.

## 2. Regulations Requiring Adequate Supervision and Competence

The Board found that Wright's failure to promptly travel to the scene of the shooting also violated three of the Police Department's Rules and Regulations, each of which relate to Wright's duties of competence as an officer and as a supervisor of other officers. (Bd. Dec. at 5.)

First, the Board found that, by his absence from the scene, Wright violated Rule and Regulation ("Rule & Reg.") 3-3(D), which requires officers to "assume responsibility," to "exercise intelligence and interest in the pursuit of his/her duties," and to perform all duties competently and above an "acceptable standard." The Board determined that, by failing to go to the scene and coordinate the investigation on-site, Wright failed to assume his supervisory responsibilities, failed to exercise intelligence, and performed incompetently as Watch Commander. (Bd. Dec. at 5.) Wright argues that he did not violate this rule because he did supervise the investigation from the police station, and because he also had a duty to watch over the station. (Count V Mem. at 23.) The Board, however, had already found that Wright was required to go to the scene of any major incident and supervise the investigation on-site, which provides an ample basis for the Board's conclusion that, by violating his General Orders, Wright was not assuming his responsibilities, exercising intelligence, or performing competently. (Bd. Dec. at 3-5.)

Second, the Board found that Wright's tardy arrival at the scene violated Rule & Reg. 3-3(E), which defines "neglect of duty" to include any "failure to give due attention to the performance of duty." (Bd. Dec. at 5.) Wright disagrees, urging that he attended to his duties by making a

judgment call to stay at the station.  (Count V Mem. at 23.)  Once again, the court defers to the Board's expertise on this issue.

Finally, the Board determined that Wright's conduct violated Rule & Reg. 1-8(B)(1), which requires supervisory officers to "lead, direct, train, supervise and evaluate members in their assigned duties."  (Bd. Dec. at 5.)  Wright argues that he made a justifiable choice to supervise the officers from the station.  (Count V Mem. at 23.)  Rule & Reg. 1-8(B)(1) requires not only supervision, however, but also "lead[ing]" and "direct[ing]"; during the administrative hearing, Chief Petersen explained[10] that, in crisis circumstances, leading and directing requires a supervisor "to actually be there and not only tell them what to do but point out mistakes that they are making and answer any questions that they would possibly have any problems with."  (Hr'g Tr. vol. IV, at 18, 3/22/05.)  Thus, there was a reasonable basis on which the Board could have concluded that "lead[ing]" and "direct[ing]" a shooting investigation requires on-site activity.  For this reason, the Board's conclusion that Wright failed to lead and direct his subordinates was supported by its factual findings.

### 3.    General Order 8-4(A): Failure to Search the Suspects

The Board also concluded that Wright's failure to search the suspects who were confined to the interview rooms violated General Order 8-4(A).  (Bd. Dec. at 6.)  This rule provides:

> When at the place of detention, the detainee shall be thoroughly searched (within the confines of the law) for any contraband or articles which might be used to injure them self or others, or deface the cell.

---

[10]    Wright attacks Chief Petersen's testimony by arguing that it was self-serving, and by noting that it was undercut by his testimony that he ordered Wright to call in additional officers, which required him to remain at the station, rather than ordering Wright to go immediately to the scene.  (Count V Reply at 8.)  The court does not reweigh evidence on administrative review, *Launis,* 151 Ill. 2d at 427-28, 603 N.E.2d at 481, and doubts that it is in a better position to evaluate Chief Petersen's testimony than the Board was.  Even so, the court notes that the alleged discrepancy is easily explained by the fact that Chief Petersen was woken from bed to respond to "the second most violent crime of that year," and therefore may have been more focused on coordinating the overall investigation and response than on monitoring or correcting the behavior of a negligent Watch Commander.  (Hr'g Tr. vol. IV, 3/22/05, at 8.)

GEN. ORDER 8-4(A). The Board concluded that this rule required Wright to search detainees before confining them in the interview room (which the Board deemed a "place of detention"). (Bd. Dec. at 6.) The Board then found that Wright did not conduct such a search of the detainee Officer Fogg brought in, that he failed to ask Fogg whether the detainee had previously been searched, and that Fogg did not volunteer any such information. (*Id.*) On this basis, the Board determined that Wright violated General Order 8-4(A).

Wright does not assert that he did search the subject. Instead, he argues that the Board's interpretation that the interview room was a "place of detention" is erroneous. (Count V Mem. 24-25.) Once again, the court generally defers to the Board's interpretations of the General Orders, and will only overturn such interpretations if they are "clearly erroneous, arbitrary or unreasonable." *LaBelle*, 265 Ill. App. 3d at 736, 638 N.E.2d at 415. The court has no difficulty concluding that the words "place of detention" can reasonably be construed to include interview rooms in which suspects are confined, handcuffed to a railing, for an extended period of time.

Wright urges that the regulation should be read as applying only to detentions in the Department's jail facility; he notes that General Order 8-4(A) is included in a section titled "Policy and Procedure for Jail Facilities;" that section 8-4 generally discusses the procedures applicable to "cells," not "interview rooms," and that a separate section, General Order 8-6, applies to the "temporary holding room." (Count V Mem. at 24-25.) Wright's reading of the rule is reasonable, but it is not the only reasonable reading. The Board's reading gives expression to the plain language of the rule, because a person detained in an interview room is surely in a "place of detention." It also finds support in the testimony of Chief Petersen and Commander Witz, who both stated that the department generally considers interview rooms to be places of detention, and that the rooms contain metal bars to which prisoners may be handcuffed for the purpose of restraint. (Hr'g Tr. vol. III, at 91, 3/10/05; Hr'g Tr. vol. IV, at 42, 3/22/05.)

Wright also argues that, as interpreted by the Board, General Order 8-4(A) is so vague that it violates his Due Process rights. (Count V Mem. at 25.) An administrative rule can be unconstitutionally vague if it fails to inform a person of common intelligence of what conduct is permitted and what is prohibited. *See Bence v. Breier*, 501 F.2d 1185, 1188 (7th Cir. 1974). There is no such problem here, however; a rule requiring subjects to be searched before being confined in a "place of detention," defined broadly, is adequate to guide officers' conduct. This is a far cry from the statute found unconstitutionally vague in *Bence*, which prohibited any conduct "unbecoming an officer and detrimental to the service." *Id.*

Therefore, the Board reasonably and constitutionally construed General Order 8-4(A) to require searches before suspects were confined to interview rooms.[11]

## B.    The Fifteen-Day Suspension

Although Chief Petersen sought Wright's termination, the Board only imposed a fifteen-day suspension. (Bd. Dec. at 8.) The Board stated that, although termination would be an appropriate penalty for a supervisor who failed to go to the scene of a major incident and failed to search suspects before their detentions, a lighter sentence would be imposed in recognition of Wright's 15-year record of service without prior disciplinary actions. (*Id.*) Wright challenges this punishment, arguing that his actions did not constitute cause for a suspension. (Count V Mem. at 25.)

Findings of wrongdoing support a suspension only when they demonstrate substantial misconduct or incapacity. *Hale v. Hellstrom*, 101 Ill. App. 3d 1127, 1130, 428 N.E.2d 1197, 1200 (3d Dist. 1981). In determining whether specified misconduct is "substantial," the court gives considerable deference to the Board, which is in the better position to determine the impact of an

---

[11]    Wright also argues that the Board's interpretation was "arbitrary," because other persons who failed to search persons detained in the interview rooms were not charged with violating General Order 8-4(A). If this argument has any relevance, it is to Wright's contention that the Board erred in concluding that the charges against him were not motivated by a desire to retaliate against him for his union activities, a contention that will be discussed below.

officer's conduct on departmental operations.  *See Merryfield v. Ill. State Police Merit Bd.*, 294 Ill. App. 3d 520, 530, 691 N.E.2d 191, 199 (4th Dist. 1998).  For this reason, the court will only overturn a decision regarding punishment if it is "arbitrary and unreasonable or unrelated to the requirements of service."  *Id.*

The court does not believe that a fifteen-day suspension is arbitrary or unreasonable.  The Board determined that a failure to go to the scene of what might have been a deadly-force incident "would be significant," given that it left critical decisions to be made by subordinate officers.  (Bd. Dec. at 8.)  Similarly, the Board found that the failure to search a prisoner before confining him was a "serious incident of misconduct." (*Id.*)  Finally, the Board expressed concerns about Wright's refusal to accept responsibility for his acts of wrongdoing.  (*Id.*)  These facts provide a reasonable basis for a fifteen-day suspension.

Wright argues that this case is like *Hale*, which held that merely technical violations of departmental rules did not justify a ten-day suspension.  101 Ill. App. 3d at 1130, 428 N.E.2d at 1200.  Specifically, the *Hale* court found that the officer had violated a departmental rule accepting assistance from two dispatchers in investigating a crime scene, without formally asking for such assistance.  *Id.*  Wright's misconduct, in contrast, went well beyond the merely technical:  he failed to provide onsite guidance to junior officers during a critical, and potentially dangerous, investigation, and allowed a suspect to be confined without searching him.  Either of these failures could have endangered the lives or safety of department employees.  Likewise distinguishable are those cases holding that certain conduct was not sufficient cause for termination.  *See, e.g., Kreiser v. Police Bd.*, 69 Ill. 2d 27, 30, 370 N.E.2d 511, 512 (1977)*; Burgett v. City of Collinsville Bd. of Fire & Police Comm'rs*, 149 Ill. App. 3d 420,  424-25, 500 N.E.2d 951, 953-54 (5th Dist. 1986).  Wright's conduct is sufficient to warrant a fifteen-day suspension, and that remains true even if it might be inadequate to justify dismissal.

Wright also argues, in passing, that the punishment decision was arbitrary because other

officers did not receive similar discipline.  (Count V Mem. at 27.)   A punishment decision may be arbitrary if it varies significantly from the discipline imposed in a "completely related" case.  *Launius v. Board of Fire & Police Comm'rs*, 151 Ill. 2d 419, 441-42, 603 N.E.2d 477, 487 (1992).   If the record does not permit meaningful comparison of the plaintiff's conduct with that other officers, on the other hand, courts will decline to make a finding of arbitrariness.  *See id.* (collecting cases).

Wright recounts a variety of misdeeds by other officers during the response to the shooting incident, including mishandling of evidence and a dispatcher's failure to dispatch officers to the scene promptly.  (Count V Mem. at 16.)  Wright offers no evidence of similarly-situated officers who were treated differently, however.  He points to the fact that Officer Glover did not search two suspects at the time they were placed in the interview room (Count V Mem. at 17), but Officer Glover testified that he searched the suspects at the time of apprehension (Hr'g Tr. vol. III, at 112, 122, 2/23/05*).  More to the point, Officer Glover, a subordinate officer, was not similarly situated to Wright, a Watch Commander who failed to proceed immediately to the scene of a major incident.  Wright does not offer evidence of any other Watch Commander (or similarly-ranking officer) who committed a similar pattern of misconduct and was treated more favorably.  Thus, his argument that his punishment was arbitrary due to differential treatment fails.

### C.     Wright's Retaliation Defense

Finally, Wright argues that the Board erred by rejecting his retaliation defense.  (Count V Mem. at 27.)  The Board found that Chief Petersen's decision to file disciplinary charges against Wright was not based on Wright's union activities.  (Bd. Dec. at 7.)  Wright argues that this finding was against the manifest weight of the evidence.  (Count V Mem. at 31.)

Wright carries a heavy burden: he must not only point to evidence that Chief Petersen retaliated against him, but he must also show that there is "no evidence that fairly tends to support" the Board's contrary finding.  *Hawkes v. Casino Queen, Inc.*, 336 Ill. App. 3d 994, 1011, 785 N.E.2d 507, 521 (5th Dist. 2003).  Deference to the Board's finding on this matter—Chief Petersen's

motivation—is particularly appropriate; the Board was in the best position to observe the conduct and demeanor of Wright and Chief Petersen. *In re D.F.*, 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002). Thus, the court will not second-guess the Board regarding the credibility of witnesses, the appropriate weight to be given conflicting evidence, or the inferences to be drawn from it. *Id.*

### 1.    Allegations of Prior Retaliation

Wright argues that Chief Petersen was retaliating against him for the "no confidence" vote that occurred in 1998, and for demanding that Petersen leave a union meeting in 1999. (Count V Mem. at 4, 28.) The long time lag between the protected conduct and the alleged retaliation, by itself, supports the Board's conclusion, absent very strong overriding evidence of a connection between the two events. *See McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996) (holding, in a Title VII case, that an eleven-month gap between an EEOC charge and an adverse employment action, combined with the absence of any further evidence of retaliation, justified a grant of summary judgment against the plaintiff's retaliation claim).

The court concludes that the evidence of retaliatory intent that Wright offers is insufficient. First, he argues that Chief Petersen committed intervening acts of retaliation between Wright's protected activities in 1998-99, and his suspension in 2005. (Count V Mem. at 4-5, 28-29.) Examples of these allegedly retaliatory acts include: (1) removing Wright from his position as Field Training Officer Supervisor in 1999; (2) refusing to promote Wright, who was serving as an acting Watch Commander, to permanent Watch Commander in 2000; (3) refusing to pay Wright a $1000 stipend for serving as an acting Watch Commander until a grievance was filed in 2000; (4) promoting another officer to the permanent Watch Commander position in 2002 instead of Wright, despite the fact that he had been acting Watch Commander for two years; and (5) giving the position of evidence technician supervisor to an officer of lower seniority than Wright in 2003.

Although it is possible to construe these incidents as retaliatory, however, that is not the only possible characterization of them. With respect to the failures to promote Wright listed above as

(1), (2), (4), and (5), the Board could have reasonably concluded that these were simply ordinary employment decisions justified by a comparison of available candidates for each position. And although Wright offers evidence that he has received favorable performance evaluations, and was liked by his colleagues (Count V Mem. at 2-3), the Board could have concluded, upon a review of this evidence, that even if Wright was a good officer, Chief Petersen did not feel that he was the best officer for these jobs. Similarly, the failure to compensate Wright for serving as an acting Watch Commander until he had filed a grievance is explained by Petersen's testimony that he did not know of the discrepancy until informed of it by Wright's grievance, after which he promptly arranged for Wright to receive the stipend. (Petersen Dep. 67:1-68:17.) At a minimum, that explanation is as compelling as is Wright's contention that Petersen was wrongfully withholding the stipend for retaliatory reasons. The Board did not err in this regard.

### 2. Alleged Investigation Irregularities

Wright next points to alleged deficiencies in Chief Petersen's handling of the investigation as evidence of retaliatory intent. Specifically, he states that Chief Petersen did not direct him to go to the scene on the night of the shooting. (Count V Mem. at 29-30.) This fact is equivocal, however; it could indicate that Chief Petersen did not care about General Order 6-3(F), but used it later as an excuse to go after Wright, or it could indicate that Chief Petersen was too busy himself responding to the shooting on the night in question to deal with directions to Wright. (*See* Hr'g Tr. vol. IV, at 8-12, 3/22/05).

Wright also points to claimed deficiencies in Witz's investigation, such as Witz's failure to preserve all possible video evidence from the night of the shooting, Witz's alleged mischaracterizations of interviewee testimony in his reports, and Witz's alleged conflict of interest in conducting the investigation. (Count V Mem. at 13, 30.) This evidence is of relatively low value, as one person's conduct tells us relatively little about another person's state of mind. Petersen, not Witz, was responsible for filing the charges, and thus the Board could appropriately give little weight

to evidence of Witz's investigatory misconduct.

Lastly, Wright argues that Petersen "rush[ed] the investigation to judgment" by filing charges based upon a preliminary report, and that he improperly relied on an investigation that had been tainted by procedural irregularities with regard to the timing of reports and their content.[12]  (*Id.* at 12-13, 30).  Once again, haste to bring disciplinary proceedings could be a sign of a desire to retaliate; it could also be explained by eagerness to get a bad officer off the police force, or by a simple disregard for formalities.  At a minimum, Wright would have to show that other disciplinary actions are typically handled in a more leisurely manner, which he has failed to do (Count V Mem. at 30); without such a comparison, evidence of Petersen's haste means nothing.  In short, none of the alleged flaws in the investigation speak unequivocally to retaliatory intent on the part of Petersen.

### 3. Allegations of Disparate Treatment

Finally, Wright points to Petersen's more favorable treatment of other officers who were engaged in misconduct during the shooting investigation, arguing that bringing an action against Wright, but not these others, evidences retaliatory intent.  (Count V Mem. at 30.)  He notes that: (1) Witz did not attend and supervise a show-up identification; (2) Glover searched suspects upon arrest (Hr'g Tr. vol. III, at 112, 122, 2/23/05), but not again upon confining them in the interview rooms; and (3) unnamed officers did not summon medical attention for potentially injured suspects. (Count V Mem. at 30.)  Wright argues that the only possible reason why Petersen could charge him, but not these others, with misconduct, was a desire to retaliate for the 1998-99 union activity.  (*Id.*) This court disagrees; Petersen could legitimately believe that each of these minor incidents of

---

[12]     The claimed irregularities were that (1) Witz did not prepare a "final report" until nineteen days after Petersen had filed charges in December of 2004, (2) Witz continued to interview witnesses after filing a preliminary report regarding Wright's conduct in September of 2004, and (3)  Witz filed a preliminary report that did not comply with departmental rules requiring such reports to contain both a clear and precise fact summary and a recommendation as to the outcome.  (Count V Mem. at 12-13.)

misconduct (if they can be so characterized) pale in comparison to Wright's failure to direct the investigation at the scene of the shooting. Having chosen to charge Wright for that omission, the Chief might have included the other charges as well, because they evidence a pattern of misconduct, even if some of them would not require discipline individually. It is simply wrong to suggest that the only possible interpretation of Petersen's failure to charge these other officers is that he was retaliating against Wright.

Wright also points to the investigation and punishment of Jones as evidence of Petersen's retaliatory motivation. (Count V Mem. at 30-31.) Jones, an investigator for the Department, received a one-day suspension for failing to report to the scene where shots had been fired in a timely manner. (Hr'g Tr. vol. III, at 89, 3/15/05.) Witz called Jones to the scene at 1:30 AM; Jones testified that he was off-duty and asleep, and that he did not go immediately to the scene because he fell back to sleep after being awoken by Witz's call. (Hr'g Tr. vol. V, 4/7/05, at 156-57.) According to Jones, Chief Petersen initially told him "not to worry about it," but then opened an investigation into the incident four months later (after discovery in Wright's case had begun), and imposed a one-day suspension. (*Id.* at 157-58.)

Wright argues that the tardy investigation, and the disparity between Jones' punishment and his own, indicates that the harsher, swifter treatment accorded to his own misconduct demonstrates retaliatory intent on Petersen's part. (Count V Mem. at 17-19.) The Board could reasonably have concluded, however, that the cases received different treatment because it is more serious to have a Watch Commander neglect his duties than a mere investigator. Furthermore, the Board could have concluded that Petersen properly drew a line between an off-duty investigator missing work because he accidentally lapsed into unconsciousness, and an on-duty Watch Commander consciously neglecting his responsibilities.

Finally, although Wright believes the timing of the investigation against Jones is suspicious, Petersen has proffered an innocent explanation for it: his reluctance to interfere with an ongoing

investigation by Cook County's public corruption unit. Wright bears the heavy burden of showing that there was no evidence upon which the Board could conclude that Petersen had legitimate motives, *see Hawkes*, 336 Ill. App. 3d at 1011, 785 N.E.2d at 521, and even proof that Petersen would not have suspended Jones but for Wright's discovery request would fail to meet this burden, given Wright's admissions that he engaged in conduct constituting a violation of his General Orders. Therefore, Jones was not similarly situated to Wright, and Petersen's differential treatment of the two officers does not provide conclusive evidence of retaliation against Wright.

Thus, the Board properly found that Wright had committed misconduct, properly rejected the retaliation defense, and imposed an appropriate punishment. Its decision survives administrative review, and Count V is dismissed with prejudice.

## II.    Law of the Case

The individual Defendants argue that Wright's claims are barred by the Board's findings under the doctrine of "law of the case." (Defs.' Reply [213] at 31.) Wright, surprisingly, does not contest the doctrine's application; rather, he argues only that the court should find that he has offered enough new evidence of his claims to override it. (Summ J. Resp. [204] at 48.)

The court concludes the doctrine is inapplicable in this context; the "law of the case" doctrine authorizes a court to adhere to its *own* prior ruling without reexamination unless a party can show that the decision was manifestly erroneous. *See Marseilles Hydro Power LLC v. Marseilles Land & Water Co.*, 481 F.3d 1002, 1003 (7th Cir. 2007). It does not bind a court reviewing a decision on appeal to blindly uphold the findings made below, *id.*, nor does it apply to a successive lawsuit relitigating issues raised in a different forum, *see Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1317 (7th Cir. 1995). This case combines flavors of both a direct appeal (through the administrative review count) and a successive lawsuit (through the § 1983 claims). Neither aspect makes it appropriate to apply law of the case doctrine to the rulings of the Board.

## III.   Issue Preclusion

The Village, but not the individual Defendants, argues that this court is bound by the Board's factual determinations under the doctrine of issue preclusion, which bars the relitigation of issues that have been previously decided and incorporated into a final judgment. *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113, 449 N.E.2d 1373, 1375 (1986). Wright has not addressed this issue in his pleadings, which deal entirely with either the law of the case doctrine (Summ. J. Resp. at 48-49), or with the related doctrine of claim preclusion (*id.* at 48 n.13; Pl.'s Br. on the Effect of Admin. Review [22], at 11-12.) The court nevertheless determines that this doctrine, too, is inapplicable here.

Federal courts follow state law principles of issue preclusion when deciding whether to afford issue preclusive effect to the judgments of state administrative agencies, absent a contrary directive in a federal statute. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986); *Waid v. Merrill Area Pub. Schs.*, 91 F.3d 857, 866 (7th Cir. 1996). Illinois law only gives issue-preclusive effect to prior decisions when those cases have been litigated to a final judgment on the merits. *Ballweg*, 114 Ill. 2d at 113, 449 N.E.2d at 1375. A judgment is not "final," for the purpose of issue preclusion, unless the potential for appellate review has been exhausted. *Id.* Although this court has affirmed the Board's decision on administrative review, Wright may yet pursue the issue with the Seventh Circuit Court of Appeals. Hence, there has not been a "final judgment" for the purposes of issue preclusion, and the Village's argument fails.

IV.    **Statute of Limitations**

Defendants contend that Wright's action is barred, in part, by the two-year Illinois statute of limitations applicable to personal injuries, 735 ILCS 5/13-202. (*E.g.*, Petersen Summ. J. Mem. at 25.) Wright has declined to respond to this argument.

The Defendants are correct that section 5/13-202 applies to Wright's § 1983 claims. *See Evans v. City of Chicago*, 434 F.3d 916, 934 (2006). Although the Defendants do not raise the issue, the court notes that a one-year limitations period applies to Wright's intentional infliction of

29

emotional distress claim, pursuant to 745 ILCS 10/8-101, which applies in tort suits against Illinois governmental entities and their employees. *Evans*, 434 F.3d at 934. Defendants, however, seek only to exclude any allegations related to wrongdoing occurring prior to June 24, 2003—two years before the filing of the original (non-amended) Complaint. (Compl. [1], June 24, 2005; Petersen Summ. J. Mem. at 24.)

Most of Wright's claims arise out of activities following the August 20, 2004 incident at Buddy's Bar, namely, the involvement of each of the Defendants in the investigation of his alleged wrongdoing on that evening, as well as their involvement in the filing of charges against Wright, and his ultimate suspension. (*See* Am. Compl. ¶¶ 77-78, 83-84, 87, 99-103.) None of these alleged wrongs occurred prior to June 24, 2003, so none are time-barred.[13]

Only Count IV, the intentional infliction of emotional distress claim, can plausibly be read to refer to earlier acts by the Defendants; it alleges generally that "the conduct of the individual Defendants alleged herein" constituted intentional infliction of emotional distress. (*Id.* ¶ 91.) The focus of Wright's summary judgment response on this Count, however, is entirely on facts relating to the investigation and discipline, all of which occurred after June 24, 2003. (Summ. J. Resp. at 46-47.) Thus, it does not appear that Wright's Count IV claim actually involves conduct outside of the applicable statute of limitations. The Defendants' motions for summary judgment on limitations grounds are granted, but only with respect to any claims of intentional infliction of emotional distress based on conduct occurring before June 24, 2003.

## V.    Summary Judgment Standard

The remaining issues come before the court on Defendants' motions for summary judgment.

---

[13]    Wright's amended complaint does recite a number of potential incidents of retaliation occurring prior to this period. (*See* Am. Compl. ¶¶ 20-26.) Read together with Wright's actual claims for relief, however, these incidents appear to be included only as evidence of alleged continuing retaliatory intent on Petersen's part, not as conduct giving rise to any independent right to relief.

Summary judgment is appropriate when the evidence, viewed in the light most favorable for the non-moving party, presents no genuine issue of material fact, so that the movant is entitled to judgment as a matter of law. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir.2005). To defeat Defendants' motions, Wright must identify sufficient evidence to sustain each element of the case he must prove at trial. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir.2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In considering these summary judgment motions, the court will construe the facts in the light most favorable to Wright, and draw all reasonable inferences in his favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir.2004).

## VI. First Amendment Retaliation Claims

In Count I, Wright claims that Petersen retaliated against him for his protected speech in violation of the First Amendment, and that the other individual defendants "acquiesced and/or agreed" to the filing of charges despite knowing of the retaliation, thereby also depriving him of his free speech rights. (Am. Compl. ¶¶ 76-81.)

### A. Protected Expressive Activity

The Defendants argue that Wright did not engage in any protected expressive activity. In order for a public employee's expression to be protected by the First Amendment, the employee must speak as a citizen on a matter of public concern, and the employee's interest in speaking must not be outweighed by the government's interest in providing efficient and effective public service. *See Spiegla*, 371 F.3d at 935; *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1014 (7th Cir. 1997). The Defendants contend that Wright has failed to offer proof that he spoke as a public citizen, that he spoke regarding a matter of public concern, or that his interest in speaking was sufficient to overcome the Department's interests.

#### 1. Speaking as a Public Citizen

Defendants argue, first, Wright's speech was part of his official duties as a police officer. (Petersen Summ. J. Mem. at 6.) If a public employee speaks pursuant to his official duties, that

speech is not protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1959-60 (2006). Wright claims that the Defendants retaliated against him for "associat[ing] with the union," for being the Union's President, and for "speak[ing] freely on matters of public concern."[14] (Summ. J. Resp. at 22.) More specifically, the Defendants have admitted that Wright:

> (1) "spearheaded" a no-confidence vote against Petersen;
>
> (2) opposed Petersen's reappointment;
>
> (3) "endorsed and supported" Petersen's opponent, Rocky Fortino, as an appointee for the position of Chief of Police,
>
> (4) "advocated for open residency"[15] for Village police officers; and
>
> (5) "led a letter writing campaign against the improper use of police insignia, which [Wright] believed presented a public safety issue . . . ."

(LR 56.1 Add'l Resp. ¶¶ 2-3.) Nothing in the record suggests that such speech was a part of Wright's duties as an officer, and it would certainly be reasonable for a jury to infer that speech on such subjects was not within his job description. Furthermore, Wright claims that the retaliation was also based upon his association with the union; such association is not among his job duties. *See Smith v. Ark. St. Hwy. Employees, Local 1315*, 441 U.S. 463, 465 (1979) (stating that public employees have a First Amendment right to be free from retaliation on the basis of association); *Glass v. Snellbaker*, No. 05-1971, 2007 WL 1723472, at *4 (D.N.J. June 14, 2007) (holding that union association does not fall within the *Garcetti* retaliation exclusion). Therefore, there is enough evidence that Wright spoke "as a citizen" to survive summary judgment.

Defendants argue that Wright's speech related solely to employee grievances, and that

---

[14] Despite the nature of his allegations, Wright has apparently chosen to forego a claim under the Illinois Public Labor Relations Act, which grants public employees, including Village police officers, a remedy in the event of retaliation premised upon their protected union activities. *See* 5 ILCS 315/10(a)(2); *Lauth v. McCollum*, 424 F.3d 631, 632 (7th Cir. 2005).

[15] "Open residency," according to the parties, refers to the right of police officers to reside outside of the municipal boundaries of Franklin Park. (LR 56.1 Add'l Resp. ¶ 3.)

allowing such speech to form the basis of a retaliation claim would "constitutionalize" the grievance system. (Defs.' Reply at 13.) Even if this is true, it would bar Wright's claim only if the filing of grievances represented all of the expressive activity on which he founds his retaliation claim, which is not the case. Moreover, the Defendants have not shown that filing grievances was among Wright's job duties. *Garcetti*, 547 U.S. at 421. Therefore, the court concludes that Defendants are not entitled to summary judgment on this issue.

### 2.    Speaking on a Topic of Public Concern

Next, the Defendants argue that Wright did not express himself on topics of public concern, as is necessary if his speech is to form the basis of a retaliation claim, because it related primarily to the working conditions of Village police officers. (Summ. J. Reply at 17.) Wright has offered sufficient evidence that his advocacy relating to Chief Petersen's fitness for office, the open-residency issue, and the police insignia issue, relate to matters of public concern.

Speech is of public concern when it relates to "any matter of political, social, or other concern to the community." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (citation omitted). Matters such as the identity of the Chief of Police, or the fact that the police force is opposed to the Chief's continuation in office, are clearly of political concern to the community. Likewise, Defendants have admitted that the open residency issue "became a political issue" (LR 56.1 Add'l Resp. ¶ 3), and that the dispute over the improper use of police insignia "led to public altercations at village board meetings" (*id.* ¶ 4), so there is evidence that speech on these matters was a matter of political concern to the community. Once again, the Defendants' focus on Wright's filing of grievances is too narrow; his allegations extend beyond internal management issues, and include speech on subjects that a jury could reasonably infer to be of interest to the public. Similarly, to the extent that Wright's association with the Union was intended to further the union's advocacy of issues such as these, that association would address a matter of public concern as well. *See Griffin v. Thomas*, 929 F.2d 1210, 1213 (7th Cir. 1991) (noting that whether association

addresses a matter of public concern is resolved by the same standards that apply to claims alleging retaliation for speech).

Defendants argue that Wright's motive was central, and that if he intended to pursue "a private feud," his speech cannot be a matter of public concern. (Summ. J. Reply at 7.) Although a speaker's motive is relevant to whether his speech is of public concern, this consideration is not dispositive. *Anderer v. Jones*, 385 F.3d 1043, 1053 (7th Cir. 2004). Courts are particularly hesitant to grant summary judgment motions on the basis of a plaintiff's state of mind. *See Ashman v. Barrows*, 438 F.3d 781, 785 (7th Cir. 2006). Curiously, Wright has offered no evidence of his motives in making any of the statements for which Chief Petersen has allegedly retaliated. Similarly, he has not offered many details as to what, specifically, he said about the issues at stake. Nevertheless, given that motive is not a dispositive factor in assessing whether speech is of public concern, and given that the subject matter on which Wright expressed himself is one that would likely interest members of the public, the court cannot conclude that the speech did not relate to matters of political concern to the community. *See Anderer*, 385 F.3d at 1053 (noting that the content of speech is the most important factor in determining whether it is of public concern).

That some of Wright's speech was on a topic of public concern does not mean that all of it was, however. Wright's retaliation claim is founded, in part, on his "leadership role" as union president relative to unidentified "officer grievances." (Summ. J. Resp. at 27; LR 56.1 Add'l ¶¶ 22, 24.) Filing grievances is not necessarily protected associational conduct; rather, it is protected only to the degree that the grievances relate to matters of public, and not private, concern. *See Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 858 (7th Cir. 1999); *Griffin*, 929 F.2d at 1215.[16]

---

[16] Wright argues, briefly, that this court should depart from the Seventh Circuit's law regarding protected associational conduct, because permitting the government to punish its employees for advocating the personal grievances of other employees would not adequately protect their associational rights. (Summ. J. Resp. at 28 n.9.) Wright cites *Balton v. City of Milwaukee* for this proposition, but although the *Balton* court briefly suggested that the Seventh Circuit's test

(continued...)

For this reason, Wright cannot recover under a First Amendment retaliation theory based upon a contention that Petersen retaliated against him for filing grievances, absent some evidence of the content of those grievances. Wright has presented no such evidence, instead merely offering a list of the grievances filed between 1998 and 2005. (List of Grievances, App. 1 to Wright Dep., Ex. Q to LR 56.1 Add'l.) This list concludes almost no information about the individual grievances; it merely identifies the applicable "Violation" using terms such as "Hire Back," "Perm. Shifts," "Training," "OT Detail," and "Ins./Vision Care." (*Id.*) Moreover, Wright, has admitted that these grievances related "primarily" to "work-related issues such as overtime and job assignments." (LR 56.1 Resp. ¶ 28.) This is not sufficient evidence for a reasonable jury to conclude that these grievances related to matters of public concern, as opposed to the sort of private employment disputes which would not be protected. *See Griffin*, 929 F.2d at 1215 (holding that union grievance relating to a teacher's performance rating did not address a matter of public concern for purposes of an associational retaliation claim).

The vagueness of Wright's evidence as to the grievances, combined with his admission that they dealt primarily with work-related issues, distinguishes his situation from *Moreland v. Sherlock*, on which he relies.[17] That case based its finding that association was constitutionally protected on a review of the content of the grievances, which is not possible here, and noted that some of the grievances related to issues such as political favoritism by the Chief Custodian of the Cook County

---

[16](...continued)
inadequately protected associational rights, it ultimately declined to reconsider that rule. 133 F.3d 1036, 1040 (7th Cir. 1998). Subsequent Seventh Circuit cases have continued to require plaintiffs to show that their association was addressed to matters of public concern, *see Klug*, 197 F.3d at 858, so the *Balton* dictum has had no effect on the controlling law in this Circuit.

[17]        Wright also cites *Quinn v. Village of Elk Grove Board of Fire & Police*, but this case provides no support for his argument. In *Quinn*, the Defendants admitted that the union association was protected conduct; accordingly, the court had no reason to address the subject matter of the union's advocacy in any depth, and therefore, provided no details concerning the grievances at issue. *See* No. 01 C 8504, 2002 WL 31875464, at *4 (N.D. Ill. Dec. 24, 2002).

Court system, as well as supervisory officials' knowledge of timekeeping frauds. *Moreland*, No. 93 C 4940, 1996 WL 111881, at *5 (N.D. Ill. Mar. 12, 1996). Grievances on such topics, involving as they do suggestions of official misconduct and favoritism, are far more likely to be of public importance than complaints relating to "overtime and job assignments."

Thus, Wright may not base his retaliation claim on an allegation that Petersen was retaliating against him based upon grievances he filed or pursued as union president, because he has failed to offer evidence that he filed any grievances that addressed matters of public concern. He has, however, offered sufficient evidence to show that his speech relating to the fitness of Chief Petersen for office, to the officer residency issue, and to the police insignia issue, was of public concern. He has also shown that his union association addressed a matter of public concern, to the extent it was used to further expression on those subjects.

### 3. Whether the Disruptive Potential of the Speech Exceeded Its Value

Even if an employee speaks as a citizen on a matter of public concern, the government may still restrict his speech if it can prove that the employee's interest in speaking is outweighed by the governmental interest in providing efficient and effective public service. *Gustafson v. Jones*, 290 F.3d 895, 909 (2002). Defendants here urge that Wright's speech and association were so disruptive to the mission of the police department that they were not protected by the First Amendment. (Cascio Summ. J. Mem. at 14.) In order to sustain their burden, the Defendants must demonstrate that they actually relied on reasonable concerns regarding the speech's disruptive potential when taking action against Wright; hypothetical concerns are insufficient for this purpose. *Gustafson*, 290 F.3d at 909-10.

Defendants here argue that the balance tipped in the Department's favor because Petersen needed to punish Wright for failing to appear at the scene of an incident. (Cascio Summ. J. Mem. at 14.) This begs the question; although Petersen's reasons to seek Wright's termination may defeat an inference of retaliation, the initial question is whether, presuming that Petersen *was*

choosing to terminate Wright based on his protected speech, such a decision was justified.

On the issue of Wright's speech, the Defendants have little to say. They first repeat the argument that Wright did not speak as a citizen (Cascio Summ. J. Mem. at 14), but that claim has already been addressed. The only discussion of the disruptive potential of Wright's speech is the following list of conclusory assertions:

> Officers refused to take advantage of Petersen's open door policy, but rather sought to battle the department in the form of union grievances and arbitrations. Such a battle resulted in an overwhelming no confidence vote and a coup of [sic] Chief Petersen for 40 days in 1999 and disrupted to [sic] the department. As a result, Petersen could not allow Wright to have a blatant disregard of the rules. Wright's actions by filing union grievances directly impact the harmony of the Department and, conversely, the provision of police services to the public.

(*Id.* at 15.) These assertions say nothing about the speech's potential to cause disruption or disharmony. (LR 56.1 Stmt. ¶¶ 27-30, 112-143.) Nor do they cite any such evidence in their memoranda. *(See, e.g.*, Cascio Summ. J. Mem. at 15.) Accordingly, Defendants are not entitled to summary judgment on the basis of their argument that Wright's expressive activities were unprotected because their disruptive potential outweighed their value.[18]

### B. Evidence that the Defendants Retaliated Against Wright

In order to set forth the second element of his prima facie claim for First Amendment retaliation, Wright must show that his expressive activities were a substantial or motivating factor in the adverse actions taken against him. *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). In order to make this showing, Wright must prove both that a defendant brought about a materially adverse change in the terms or conditions of Wright's employment, and that the defendant's actions were motivated by a desire to retaliate. *Id.; Dahm v. Flynn*, 60 F.3d 253, 257 (1994).

Wright claims that Petersen, Witz, and Cascio all retaliated against him. (Am. Compl. ¶ 81.)

---

[18]     The Defendants have not argued that the acting Watch Commander position involved so much discretionary authority that Petersen could legitimately based decisions regarding hiring or termination on a candidate's political affiliation or advocacy. *See Branti v. Finkel*, 445 U.S. 507, 518 (1980).

Defendants, in turn, argue that he has not produced sufficient evidence to show that any Defendant took any adverse action against him with a retaliatory motive. (Summ. J. Reply at 20.) The court will assess the evidence against each of the individual Defendants in turn.

First, however, the court must note an important fact relating to the gap in time between the speech and the alleged retaliation in this case. Wright's protected conduct was his speech and union association directed towards advocacy of the open-residency issue, advocacy related to the police insignia issue, and his opposition to Chief Petersen's leadership. His opposition to Chief Petersen's leadership took place in 1998 through the Spring of 1999. (Summ. J. Resp. at 2.) Although he expressed uncertainty on the subject, Wright stated that he believed he advocated for open residency in 1997. (Wright Dep. Pt. I at 37:11.) The letter writing campaign took place during 1998. (*Id.* at 189:8-11.) Wright's advocacy of grievances continued until 2005, but as discussed above, he has failed to produce evidence showing that advocacy or association to be protected. Therefore, all of the protected speech and associational conduct on which Wright may properly base his claim took place between 1997 and the Spring of 1999—more than five years before the Buddy's shooting incident, which took place on August 20, 2004, and therefore more than five years before any of the allegedly retaliatory conduct at issue here.

When years elapse between protected conduct and alleged retaliation, the gap in time cuts against any finding of retaliation. *Oest v. Ill. Dept. of Corrs.*, 240 F.3d 605, 616 (7th Cir. 2001) (stating that a substantial time-lapse cuts against a finding of retaliation in the Title VII case); *see Spiegla*, 371 F.3d at 943 n.10 (noting that the causation analysis in First Amendment retaliation cases tracks the Title VII doctrine). For this reason, the court believes that, in order to establish his *prima facie* showing, Wright must proffer evidence sufficient to permit a reasonable jury to infer the the Defendants acted with retaliatory motives, *despite* the presence of an undisputed fact strongly

supporting the opposite inference.[19]

### 1. Evidence that Petersen Retaliated Against Wright

Wright focuses the bulk of his retaliation allegations against Petersen. Petersen does not seem to contest that the decision to seek Wright's termination was a materially adverse action, but he does urge that his decision was not motivated by a desire to retaliate. (Petersen Summ. J. Mem. at 12-16.) Wright based his retaliation claim against Petersen on three types of support: (1) contentions that Petersen harbored hostility towards Wright because of his protected conduct, (2) contentions that Petersen had previously retaliated against Wright, and (3) contentions that Petersen had treated Wright differently than similarly situated officers.

### a. Contentions that Petersen Harbored Hostility Against Wright

Wright argues that Petersen's prior statements show that Petersen desired to retaliate against Wright for his protected speech. First, Wright produces evidence that he asked Chief Petersen to leave a union meeting in 1999 at which labor issues were to be discussed, and that the Chief resisted, stating something like, "this is my police station, I'm not leaving." (Petersen Am. Answer ¶ 19; Wright Dep. Pt. II at 227:15-19; Quiroga Dep. at 19:7-12; Henniger Dep. at 131:13-15.) There is no evidence, however, that Petersen's reluctance to leave was related in any way to anger at Wright personally, or to the union's no-confidence vote in the previous year.

Second, Wright points to Petersen's admission that he has publicly complained about Wright's union activities. (Petersen Am. Answer ¶ 14.) Wright provides no evidence, however, that Petersen's complaints related to his protected conduct—that is, his advocacy related to Chief Petersen's tenure, the open-residency issue, or the insignia issue. In the absence of any such evidence, there is no basis on which a jury could conclude that Petersen's unspecified complaints

---

[19] Alternatively, if the court found that Wright had presented evidence creating an inference of retaliation, he could survive summary judgment only by showing that Defendants' non-retaliatory reason for the suspension (his rules violations) was a pretext.

related to those issues, rather than unprotected conduct, such as the filing of grievances on work-related matters.

Third, Wright contends that Petersen had "often voiced his dislike for Wright." (Summ. J. Resp. at 33; LR 56.1 Add'l Resp. ¶ 8.) The only source cited that provides even slight support for this assertion was Officer Jones. Jones testified that, although he couldn't remember any specific dates or times, he recalled that Petersen had made comments about "not liking Rob Wright" on more than one occasion. (Jones Dep. at 165:9-18.) The admissibility of this vague testimony is dubious; despite being asked for details, Jones was unable to recall any of the specifics necessary to establish foundation for these statements, such as when and where they were made, and who was present at the time. *See Kemper/Prime Indus. Partners v. Montgomery Waston Ams., Inc.*, No. 97 C. 4278, 1998 WL 704049, at *4 (N.D. Ill. 1998). Regardless, even if such vague statements were admissible, they would be of little evidentiary value; Wright must prove, not just that Petersen did not like him, but that he disliked him *because of* his prior protected conduct, and that the dislike *motivated* his subsequent actions. *See Rakovich v. Wade*, 850 F.2d 1180, 1191, 1193 (7th Cir. 1988) (*en banc*) (noting that a directed verdict is appropriate if plaintiff shows only that the defendant had a generic dislike of the defendant, without showing either that the dislike arose from the protected expression, or that the dislike motivated the adverse action). Thus, statements by Petersen expressing a generalized dislike of Wright do little to establish a retaliatory motive.

Fourth, Wright contends that Petersen has complained about Wright's filing of grievances, and his general interference with Petersen's management of the Department. (Summ. J. Resp. at 33.) This cuts against Wright, not for him. Because Wright has failed to offer evidence that the grievances related to a matter of public concern, it would not violate the First Amendment for Petersen to discriminate against Wright on that basis, even if such discrimination is generally repugnant. *See Rakovich*, 850 F.2d at 1193 (noting that generalized animus does not suffice to show retaliation, absent a connection with protected speech). Thus, evidence that Petersen was

angry about the grievances does not help Wright's case.

Fifth, Wright contends that Petersen "suggested to one officer that he employ physical violence" against Wright. (Summ. J. Resp. at 33.) Wright bases this contention on the testimony of Officer Ross. (LR 56.1 Add'l ¶ 12-17.) Ross testified that, in June of 2000, he had a conversation with Chief Petersen in which Petersen complained that he was unable to appoint qualified officers to certain posts because of Wright's opposition. (Ross Dep., Ex. BB to LR 56.1 Add'l, at 18:14-17, 21:8-22.) Petersen then, according to Ross, said, "Steve, you were in the military; you know what blanket parties are." (*Id.* at 19:16-18, 22:2-7.) "Blanket parties," according to Ross, are a military practice in which a misbehaving individual is "pummeled" or "physically beat up." (Ross Dep. at 20:13-19.) Ross testified that he asked Petersen if he "wanted [Ross] to inflict physical violence on people," and that in response, he "smiled" a "devilish grin." (*Id.* at 19:18-20, 20:8-11.)

Taken in the light most favorable to Wright, the "blanket party" exchange could reasonably be interpreted as an indication that Petersen was angry at Wright; it might even support the implication that Petersen wished for Ross to harm Wright. What it does not do, however, is connect that hostility to Wright's protected speech or association. Rather, there is a strong implication that Petersen's anger was directed towards Wright's advocacy of officer grievances, and not to the issues he advocated in 1997-99. Thus, the "blanket party" comment, however unseemly, does not provide support for Wright's First Amendment retaliation claim.

Finally, Wright contends that Petersen expressed a desire to remove him from his role as union president, both to union Vice-President Konwinski and to Mayor Pritchett. (Summ. J. Resp. at 33-34; LR 56.1 Add'l ¶¶ 10, 18.) This allegation of bias suffers from a similar defect; it might support an inference that Petersen investigated Wright and brought charges against him in order to end his tenure as union president, but it fails to connect Petersen's alleged desire to rid himself of Wright with Wright's protected expression. In fact, Konwinski emphasized that Petersen's

statement related instead to Wright's advocacy of grievances.  (Konwinski Dep. at 56:20-23.)

Wright has failed to show Petersen's retaliatory motive directly, on the basis of Petersen's prior statements, because although the statements might be evidence that Petersen did not like Wright because of his union advocacy, there is nothing that connects Petersen's dislike with Wright's *protected* expression in 1997-99.

### b.  Contentions of Intervening Retaliation

In order to bridge the yawning gap between Wright's protected speech in 1997-99 and the alleged retaliation in 2004, Wright argues that Petersen engaged in a campaign of retaliation against him stretching over the intervening years.   Wright points to several alleged acts of intervening retaliation: (1) Petersen removed him from the position of Field Training Officer Supervisor in May of 1999 (LR 56.1 ¶ 131); (2) Petersen abolished the Watch Commander position, which Wright wanted to fill, in late 1999 (*id.* ¶ 134); (3) after recreating the Watch Commander position in 2002, Petersen chose another officer for the position rather than Wright, even though Wright had been serving as acting Watch Commander (*id.* ¶ 136); (4) Petersen gave the Evidence Technician Supervisor position, which Wright wanted, to an officer of lower seniority than Wright, in March of 2003 (*id.* ¶ 139).

Wright contends that the denial of these opportunities was retaliatory, pointing only to evidence suggesting that he was qualified to do these jobs, and that Petersen gave different reasons for refusing to give the different positions to Wright.  (Summ. J. Resp. at 33.)  What is lacking, once again, is any indication that the denial of these opportunities related in any way to Wright's speech in 1997-99.  Wright's best argument relates to Petersen's decision to remove him from the Field Training position, which took place two days after Petersen refused to leave the union meeting, according to Wright.   (Wright Bd. Test. at 128:16-17.)   As discussed above, however, Wright has produced no evidence that Petersen's outburst at that meeting had anything to do with Wright's protected speech or association.  The only remaining basis for an inference of

retaliation is the temporal proximity between Wright's last protected speech act—his union advocacy opposing Petersen's reappointment and supporting Fortino in April of 1999—and Petersen's removal of Wright in May.  (Petersen Am. Answer ¶¶ 18-20.)

Thus, at most, Wright has raised a very weak inference, based on timing alone, that Petersen removed him from the FTO position in retaliation for his support for Fortino.  *But see Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (finding that a twenty-six day gap, standing alone, was insufficient to create a triable issue regarding an ADA and Title VII retaliation claim).  Wright has similarly failed to produce evidence linking the later three instances of alleged retaliation with his protected speech, and these instances are made even less likely candidates for retaliation due to their later dates; therefore, they fail to provide any support Wright's retaliation claim.  In the court's view, only the first incident could be reasonably viewed as retaliatory, and even ironclad evidence of retaliation in 1999 would not be sufficient, by itself, to permit a jury to reasonably infer retaliation in December of 2004.   *See Oest*, 240 F.3d at 616.

Given that Wright's only evidence that Petersen's investigation and decision to bring charges in 2004 rested upon the comments and posting decisions discussed above (Summ. J. Resp. at 32-34), the court concludes that he has failed to produce enough evidence that Petersen retaliated against him to survive summary judgment on Count I.[20]

---

[20]     As the court has concluded that Wright has failed to make a *prima facie* showing of retaliation, it need not discuss in detail the final prong of the First Amendment retaliation test, which is whether Wright has demonstrated that the Defendants stated reasons for investigating him and filing charges against were pretextual.  *See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).  The court notes, however, that Wright has admitted that he failed to go to the scene of a major incident for more than an hour after being notified of it (LR 56.1 Resp. ¶ 32), which constituted a serious violation of his general orders.  Thus, it would be nearly impossible for Wright to demonstrate that this admitted misconduct was not the "real reason" for the charges against him.  *See id.* (holding that a plaintiff had failed to show pretext because the record was "replete with evidence" supporting the charges against him, and because he presented minimal direct evidence of any retaliatory motive).

## 2.    Evidence that Witz and Cascio Retaliated Against Wright

Wright claims that the other two individual defendants retaliated against him by "acquiesc[ing] and/or agree[ing]" with Petersen's decision to file charges against him, despite knowing that Petersen's actions were motivated by a desire to retaliate. (Am. Compl. ¶ 78.) These defendants have moved for summary judgment, arguing both that "acquiescing" or "agreeing" with the termination charges cannot subject them to liability because it does not involve a sufficient level of personal involvement in depriving the plaintiff of his rights, and that there is inadequate evidence that any of them were motivated by an impulse to retaliate. (*E.g.*, Witz Summ. J. Mem. at 4-6, 15-18.) Wright offers no evidence suggesting that any of these defendants harbored hostility towards him based on his protected expression in 1997-99.[21] More critically, he has offered no response to their arguments that they did not engage in any conduct that could constitute a constitutional deprivation, because they lacked the power to initiate termination proceedings against Wright. By failing to respond to this argument, Wright has forfeited any argument that Witz or Cascio deprived him of his constitutional rights for the purposes of a § 1983 claim. *See Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 608-09 (7th Cir. 2007) (arguments not raised in response to summary judgment motion are waived); *Murdock v. Ill. Dept. of Transp.*, No. 04 C 8020, 2007 WL 2317265, at *5 n.3 (N.D. Ill. July 19, 2007) (collecting cases). Moreover, even if Wright had not forfeited this argument, he has certainly failed to show that the right to a § 1983 claim in these circumstances (i.e., subordinates following a superior's order to investigate a co-worker) was clearly established in 2005; therefore, if Cascio and Witz had committed any First Amendment

---

[21]    Wright confines his discussion of Witz's and Cascio's allegedly retaliatory motives to a single paragraph setting out comments that could be taken, at best, to show hostility towards Wright's advocacy of grievances. (Summ. J. Resp. at 34.) As discussed above, he has not shown that his advocacy on that subject was protected speech or associational conduct, so evidence of their hostility toward him on that ground provides no basis for inferring that they retaliated based on his opposition to Petersen's tenure, his advocacy of open-residency, or his advocacy related to the police insignia issue.

violation, they would be entitled to qualified immunity against Wright's claims. *See White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002) (noting that plaintiffs bear the burden of demonstrating that a constitutional right was clearly established at the time of the alleged deprivation, if they are to defeat the qualified immunity defense).

For these reasons, the Defendants' motions for summary judgment on Count I are granted.

## VII.    Equal Protection "Class of One" Claims

The Defendants have moved for summary judgment on Count II, Wright's equal protection claim. Wright brings this claim under the "class of one" theory (Summ. J. Resp. at 40), which provides a right of relief to public employees if they are injured by a government action for which "no sound reason can be hypothesized," so that "the action would be inexplicable unless animus had motivated it." *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005) (quoting *Lamers Dairy Inc. v. USDA*, 379 F.3d 466, 473 (7th Cir. 2004)).

The Defendants point to Wright's violation of General Order 6-3(F) as a rational basis for investigating him and bringing termination charges against him. (Village Summ. J. Mem. at 15.) The court defers to the Board's reasonable interpretation of its own regulation, *see Macias v. N.M. Dept. of Labor*, 21 F.3d 366, 369 (10th Cir. 1994), and concludes that, by acknowledging that he did not go immediately to the scene of the shooting, Wright has admitted engaging in conduct that violated departmental rules, providing a reasonable basis for the charges. Even if this deference is inappropriate, moreover, and Wright's reading is the only plausible one, it is hypothetically possible that Petersen and the others could have believed that the Board would find as it did, and "hypothetically" is good enough, for the purpose of a "class of one" claim. *Lauth*, 424 F.3d at 634.

Wright argues that his equal protection claim should succeed because it closely resembles the claim upheld in *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982). *Ciechon* involved a paramedic who was terminated after the death of a patient, in response to media pressure. *Id.* at 514-15. The court based its conclusion that the decision was so arbitrary and irrational as to

constitute an equal protection violation on the fact that her co-paramedic received no discipline at all, even though he had been equally responsible for all of the patient's care. *Id.* at 522.

Subsequent decisions have emphasized the narrow scope of *Ciechon*'s holding; it applies only when the plaintiff was treated differently than someone who is "*prima facie* identical in all relevant respects." *Lauth*, 424 F.3d at 634 (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)).[22] Wright, however, has not offered evidence of any other officer who was not disciplined after violating General Order 6-3(F). Therefore, *Ciechon* does not apply, and Wright's equal protection claim must fail.[23]

## VIII. Section 1983 Conspiracy Claims

The Defendants have also moved for summary judgment on Wright's § 1983 conspiracy claim. They argue both that he has insufficient evidence of any conspiracy, and that his claim is barred by the intra-corporate conspiracy doctrine. (Petersen Summ. J. Mem. at 19-21.) Without rehashing the evidence discussed above, the court concludes that Wright has failed to offer evidence that any of the individual Defendants intended to violate his rights, and hence, he has also failed to show that these Defendants agreed with each other to do so. The court need not reach

---

[22] This case is strikingly similar to *Lauth*, in which a police officer brought a § 1983 lawsuit against his police chief, arguing that the chief had violated his equal protection rights by suspending him for sixty days as a punishment for violating departmental and statutory rules in handling a missing persons report. 424 F.3d at 631-32. *Lauth*, too, involved an allegation that the disciplinary action had been motivated by anti-union animus. *Id.* at 632. Given these similarities, it is worth repeating the *Lauth* court's observation that "there is clearly something wrong with a suit of this character coming into federal court dressed as a constitutional case . . . ," especially given the adequate remedies provided by Illinois labor law in such circumstances. *Id.*; *see* 5 ILCS 315/10(a)(2).

[23] The court notes that its decision on Count II rests on two alternate grounds. First, even if the Defendants' actions somehow constituted an equal protection violation, it was certainly not "clearly established." *Lauth*, which was decided in September of 2005, stated that these claims were attended by uncertainty. 424 F.3d at 632 (collecting cases discussing the instability of Seventh Circuit doctrine in this area). Second, even if Petersen had violated Wright's equal protection rights by bringing charges against him, Witz and Cascio would be entitled to summary judgment because Wright has failed to demonstrate any action taken by them that harmed him in any constitutionally cognizable way, as discussed above.

the Defendants' other argument, because Wright's conspiracy claim suffers from deeper flaws.

To prove the existence of an unlawful conspiracy under § 1983, a plaintiff must show that private individuals conspired with state actors to deprive him of his constitutional rights, that the private individuals were wilful participants in joint activity with the state actors, and that the plaintiff was deprived of a right secured by the Constitution or laws of the United States as a result of the conspiracy. *See Reynolds v. Jamison*, 488 F.3d 756, 764 n.4 (7th Cir. 2007). Wright bases his conspiracy claim on the alleged violation of his First and Fourteenth Amendment rights, but as discussed above, he has failed to prove any such violation, which is fatal to his conspiracy claim. *See id.* at 764 n.4. Even worse, Wright has failed to offer any evidence that any of the Count III defendants are private individuals, rather than state actors, which means he cannot maintain a conspiracy claim. *Thayer v. Chiczewski*, No. 07 C 1290, 2007 WL 3447931, at *5 (N.D. Ill. Nov. 13, 2007) (dismissing § 1983 conspiracy claim for failure to allege that private individuals were involved in the conspiracy); *see Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (stating that proof of a § 1983 conspiracy claim requires an agreement between a state official and a private individual to deprive a plaintiff of his rights). Thus, the Defendants are entitled to summary judgment on Count III.

## IX.    Procedural Due Process Claims

Petersen and the Village have also moved for summary judgment on Count VI, Wright's procedural due process claim. Wright's due process claim has two components: first, he argues that the Board's decision was improperly influenced by *ex parte* communications, and second, he argues that Petersen violated Wright's due process rights by investigating and charging him for improper purposes. (Summ. J. Resp. at 44-46.) Each of these components will be considered in turn.

Wright argues that the Board's decision was tainted because Petersen told the Board, outside of Wright's presence, that he had a "slam-dunk case against Wright," that Wright had failed

to show up at the scene, and that Wright did not do his job. (Summ. J. Resp. at 18, 44.) An *ex parte* communication violates due process only if it prejudices an individual's ability to present his case to a decisionmaker or rebut contrary evidence. *See Simer v. Rios*, 661 F.2d 655, 680 (7th Cir. 1981); *D'Acquisto v. Washington*, 640 F. Supp. 594, 621 (N.D. Ill. 1986); *cf. Sullivan v. Dept. of Navy*, 720 F.2d 1266, 1269 (Fed. Cir. 1983) (finding that a government employee's termination was void due to an extended series of *ex parte* communications between his accuser and the decisionmaker, when the employee had no opportunity to either hear the evidence against him or cross-examine his accusers). There is no suggestion that any such prejudice occurred in this case; Petersen testified at the termination hearing, and was subject to cross-examination by Wright's attorney. Wright has failed to present any evidence that Petersen communicated anything to the Board in an *ex parte* setting that was not repeated in the hearing. Therefore, Wright cannot show that he was harmed by Petersen's off-the-record comments regarding the merits of the case.[24]

Wright also argues, very briefly, that Petersen violated his due process rights by investigating him and by seeking his termination based on improper motives, citing *Ciechon*. *Ciechon* stands for the narrow proposition that an employee may not be discharged based upon what might be called "sham process"—that is, a hearing which appears to be proper, despite the fact that its outcome has been fixed in advance. 686 F.2d at 517, 521. *Ciechon* held that, where

---

[24]     While discussing the *ex parte* issue, Wright shifts gears momentarily, and seems to argue instead that the Board's decision was tainted by bias against him. The fact that the Board heard stray comments about Wright's case *ex parte* does not constitute evidence of bias, however. *See White v. Indiana Parole Bd.*, 266 F.3d 759, 767 (7th Cir. 2001). Furthermore, although Wright claims that "the Commissioners" stated that "we just need good people, people that are supportive of our administration," this contention falls short of demonstrating bias, for several reasons. First, there is no evidence for it; the cited pages of Regan's deposition contain no such statement. (LR 56.1 Add'l ¶ 25; Regan Dep. at 30-31.) Second, there is insufficient context to establish that this statement even related to Wright, or to provide sufficient evidence for a jury to conclude that a majority of the Commissioners shared such a view. Furthermore, the fact that the Board confined its sanction to a fifteen-day suspension, rather than ordering the termination sought by Petersen, suggests that the Board remained impartial in reviewing the charges against Wright. Thus, Wright has not produced sufficient evidence for a jury to conclude that the Board's decision was infected by bias against him.

a municipality decides in advance to terminate an employee, and employs biased procedures that involve willful blindness to contrary evidence in order to bring about that result, due process has not been afforded. *Id.* at 520-21. *Ciechon*, in other words, stands for the commonsense notion that "an opportunity to be heard" requires a decisionmaker who is willing to listen. *Ryan v. Ill. Dept. of Children and Family Servs.*, 185 F.3d 751, 762 (7th Cir. 1999) (citing *Ciechon* for this proposition).

Wright has not produced evidence that the Board had prejudged his claim, so his due process claim does not fall with the rule of *Ciechon*. He argues only that Petersen's investigation, and decision to file charges, was biased. (Summ. J. Resp. at 45-46.) Even if Wright had a due process property interest in not being investigated or brought before a Board hearing—an issue on which he has offered no argument at all—*Ciechon* does not create a cause of action in such circumstances. *Ciechon* could only be read to authorize a generalized cause of action for any improperly motivated workplace inquiries or disciplinary proceedings by ignoring its cautionary note that "we have no intention of opening the floodgates to review all municipal personnel decisions." 686 F.2d at 517. Therefore, the Due Process clause does not provide a cause of action for public employees based upon retaliatory investigations or the retaliatory initiation of proceedings, unless both the investigation and the resulting proceedings are a sham. As Wright has not produced any evidence to show that the proceedings against him had been predecided, his due process claim must fail.

## X.    Municipal Liability

Wright seeks to hold the Village liable for the acts of Chief Petersen, under the theory that the Chief had final policymaking authority for the Village. (Summ. J. Resp. at 19.) Although the court has little doubt that Chief Petersen is a final policymaking figure with regards to the decision to initiate investigations and disciplinary proceedings (*see, e.g.,* LR 56.1 ¶ 14), it need not reach this issue. Wright's claim for municipal liability depends critically on proof of a violation of law by Chief Petersen. *See Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (noting that a

municipality cannot be liable under § 1983 unless one of its officers is liable on an underlying claim).  Therefore, the court's determination that summary judgment is appropriate on all counts against Chief Petersen also disposes of Wright's claim against the Village.

**XIII.    Additional Issues**

Count IV, Wight has asserted a state law claim for intentional infliction of emotional distress. Having entered summary judgment on all of the pending federal claims in this case, the court declines to exercise supplemental jurisdiction over Count IV.  Purusant to 28 U.S.C. § 1367(c)(3), Count IV is dismissed without prejudice.

Petersen claims that he is entitled to absolute immunity, analogizing his role in the disciplinary process to that of a prosecutor.  As Wright has not shown that he has any valid claims against Petersen, the court need not decide whether Petersen is entitled to absolute immunity.

The individual defendants claim that they are entitled to qualified immunity, on the ground that they did not violate any clearly established constitutional rights belonging to Wright.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (government officials performing discretionary functions are immune from civil liability so long as they do not violate clearly established rights of which a reasonable person would have known).  Wright implicitly concedes that all of the Defendants' actions in this case were the sort of discretionary functions to which qualified immunity may apply, arguing only that the Defendants violated his clearly established rights.  (Summ. J. Resp. at 51-54.)  Given that Wright has failed to produce sufficient evidence that any of his constitutional rights were violated, it follows that he has not demonstrated a violation of any clearly established constitutional rights.  Thus, all of the individual defendants are entitled to qualified immunity for the claims against them.

Finally, the Defendants seek summary judgment regarding the appropriateness of Wright's prayer for punitive damages.  Given that Wright has no claims that survive summary judgment, this issue is moot, and the court will not address it.

## CONCLUSION

For the foregoing reasons, Count IV is dismissed without prejudice. The motions for summary judgment filed by the Village [173], Petersen [174], Cascio [176], and Witz [178] are otherwise granted. Count IV is dismissed without prejudice. Furthermore, the court affirms the Board's decision on its administrative review, and accordingly, dismisses Count V with prejudice. Judgment is entered in favor of Defendants.

ENTER:

Dated: March 25, 2008

_____
REBECCA R. PALLMEYER
United States District Judge